**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

---

WILLIAM LOOMIS,

                             Plaintiff,                       6:19-cv-1131 (BKS/ATB)

v.

ACE AMERICAN INSURANCE COMPANY,

                             Defendant.

---

**Appearances:**

*For Plaintiff:*
Martha L. Berry
Michael J. Longstreet
Longstreet & Berry, LLP
P.O. Box 249
Fayetteville, NY 13066

*For Defendant:*
Kacey Houston Walker
Kurt M. Mullen
Nixon Peabody LLP
Exchange Place
53 State Street
Boston, MA 02109

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

Plaintiff William Loomis commenced this action in Oneida County Supreme Court

challenging Defendant ACE American Insurance Company's rejection of his claim for

underinsured motorists benefits in connection with an accident that occurred while Plaintiff was

driving a vehicle insured by Defendant. (Dkt. No. 2). Defendant subsequently removed the

action to this Court, invoking this Court's federal diversity jurisdiction. (Dkt. No. 1). Presently

before the Court are the parties' cross-motions for summary judgment under Rule 56 of the

Federal Rules of Civil Procedure. (Dkt. Nos. 20, 23). The Court heard oral argument on the

motions on February 5, 2020. For the reasons that follow, the Court grants Plaintiff's motion and

denies Defendant's motion with respect to Plaintiff's claim under Indiana law, and grants

Defendant's motion and denies Plaintiff's motion with respect to Plaintiff's claim under New

York law.

## II.   FACTS[1]

### A.   Factual Background

Plaintiff, a resident of Oneida County, New York, was injured on October 2, 2017 while

driving a truck owned by his employer, XPO Logistics ("XPO") in the Town of Annsville, New

York. (Dkt. No. 20-23, ¶¶ 1-2, 6; Dkt. No. 23-7, ¶¶ 1-2, 6; Dkt. No. 20-19, ¶¶ 2-3). The accident

occurred when another vehicle crossed over the center lane and crashed into Plaintiff's vehicle

head-on, with both vehicles traveling at approximately 50 miles per hour. (Dkt. No. 20-23, ¶ 2;

Dkt. No. 23-7, ¶ 2; Dkt. No. 20-19, ¶ 4). The driver of the other vehicle died at the scene, while

Plaintiff was taken away by ambulance. (Dkt. No. 20-23, ¶ 3; Dkt. No. 23-7, ¶ 3; Dkt. No. 20-19,

¶¶ 6-7). At the time of the accident, the truck that Plaintiff was driving was registered in the State

of Indiana and garaged in the State of New York. (Dkt. No. 20-23, ¶ 5; Dkt. No. 23-7, ¶ 5).

The other vehicle involved in Plaintiff's accident was insured by State Farm Mutual

Automobile Insurance Company ("State Farm"). (Dkt. No. 20-23, ¶ 4; Dkt. No. 23-7, ¶ 4).

Plaintiff made a claim against the other driver's estate for the injuries he suffered as a result of

---

[1] The following facts are drawn from the parties' statements of undisputed material facts and responses pursuant to Local Rule 7.1(a)(3), (Dkt. Nos. 20-23, 23-7, 26, 29), to the extent those facts are well-supported by pinpoint citations to the record, as well as the exhibits attached thereto and cited therein to the extent they are admissible as evidence. In considering the parties' cross-motions for summary judgment, the Court "in each case constru[es] the evidence in the light most favorable to the non-moving party." *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 621-22 (2d Cir. 2008); *see also Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).

the accident. (Dkt. No. 20-23, ¶ 7; Dkt. No. 23-7, ¶ 7). Plaintiff's claim was settled for $50,000—the full amount of the State Farm policy limit—and State Farm paid that amount to Plaintiff. (Dkt. No. 20-23, ¶ 8; Dkt. No. 23-7, ¶ 8; Dkt. No. 20-7; Dkt. No. 20-8). Plaintiff notified Defendant, the insurer of the XPO-owned vehicle he was driving, of his intent to pursue a claim for supplemental underinsured motorist coverage, and this coverage was denied in writing on the grounds that "there is no Uninsured/Underinsured Motorist Coverage in New York State"[2] under the relevant policies. (Dkt. No. 20-23, ¶ 19; Dkt. No. 23-7, ¶ 19; Dkt. No. 20-4; Dkt. No. 20-6).

### B.    The XSA Policy

At the time of his accident, the vehicle Plaintiff was driving was insured by a policy Defendant issued to XPO, with the policy number XSA H25097257 (the "XSA Policy"). (Dkt. No. 20-23, ¶¶ 10-11; Dkt. No. 23-7, ¶¶ 10-11; Dkt. No. 20-15). The XSA Policy provides coverage for "[a]ny auto excluding Private Passenger Type Vehicles; and excluding any auto while involved in intrastate operations . . . in the states of GA, KS, KY, MS and TX." (Dkt. No. 20-15, at 65). The key terms of the XSA policy are included in a form titled "Excess Business Auto Coverage Form." (*Id.* at 39). The XSA Policy also includes declarations describing it as an "Excess Business Auto Policy" and "Excess Truckers Liability Policy." (*Id.* at 28). The XSA Policy applies to the period from October 1, 2017 to October 1, 2018, and provides for a $7 million Limit of Insurance for any one accident or loss. (*Id.* at 28-29). The XSA Policy also includes a $3 million self-insured "Retained Limit," defined as "the amount [XPO] must pay before the Limits of Insurance become applicable." (*Id.* at 29, 51). The XSA Policy provides that

---

[2] The denial letter did not reference Indiana.

Defendant "will pay the 'insured' for the 'ultimate net loss'[3] in excess of the 'retained limit'

because of 'bodily injury' or 'property damage' to which [the XSA Policy] applies, caused by an

'accident' and resulting from the ownership, maintenance or use of a covered 'auto.'" (*Id.* at

39).[4] The XSA Policy "does not apply to defense, investigation, settlement or legal expenses, or

prejudgment interest arising out of any 'accident', but [Defendant] shall have the right and

opportunity to assume from the insured the defense and control of any claim or 'suit', including

any appeal from a judgment, seeking payment of damages covered under [the XSA Policy]

arising out of such 'accident' that [Defendant] believe[s is] likely to exceed the 'retained limit.'"

(*Id.*).

The parties' dispute centers on the XSA Policy's provisions related to Uninsured and

Underinsured Motorist Coverage, a type of insurance that is triggered when an insured driver is

in an accident with an at-fault driver who does not have insurance ("Uninsured," or "UM,"

coverage) or whose insurance is insufficient to fully cover the other driver's damages

("Underinsured," or "UIM," coverage). The XSA Policy expressly states that it does not cover

damage "caused by an 'accident' with an uninsured or underinsured 'auto,'" but also contains

language suggesting that that exclusion may be modified by a separate endorsement: "No one

will be entitled to receive duplicate payments for the same elements of 'loss' under this coverage

form *and any Uninsured Motorists Coverage endorsement or Underinsured Motorists Coverage*

---

[3] The XSA Policy defines "ultimate net loss" as "the total amount the 'insured' is legally obligated to pay as damages for a covered claim or 'suit' either by adjudication or a settlement to which we agree in writing, and includes deductions for recoveries and salvages which have or will be paid." (*Id.* at 51).

[4] The XSA Policy also contains a provision labeled "Other Insurance," which provides that "[i]f other insurance is available to the 'insured' for a loss we cover under this policy, this insurance is excess over that other insurance, unless that insurance is written specifically to apply in excess of the Limits of Insurance shown in the Declarations of this policy. When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of: (1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; (2) The total of all deductible and self-insured amounts under all that other insurance; and (3) The 'retained limit' shown in the Declarations of this policy." (*Id.* at 46).

*endorsement attached to this policy*." (*Id.* at 44 (emphasis added)). On a page titled "Uninsured Motorists/Underinsured Motorist Coverage Summary," the policy states that "[n]o coverage is offered or provided for vehicles principally garaged or registered in . . . [a]ll states except AK, FL, LA, NH, VT, WV"; that "[XPO has] rejected coverage in . . . AK, FL, LA, NH, WV"; and that coverage is provided in Vermont. (*Id.* at 25; *see also id.* at 96 (endorsement providing a $100,000 uninsured/underinsured motorists insurance limit for vehicles principally garaged in Vermont)).

In connection with its cross-motion, Defendant submitted a declaration from Sean Fellows, a Senior Manager of Global Risk Management at XPO who was "authorized to sign automobile coverage selection/rejection forms on behalf of XPO" in connection with XPO's purchase of the XSA Policy. (Dkt. No. 23-4, ¶¶ 1-2). The declaration attaches the "coverage selection/rejection forms for excess uninsured and excess underinsured motorist coverage that [Fellows] signed or received on or about September 29, 2017" in connection with the XSA Policy. (*Id.* ¶ 3). These forms include a form asking the generalized questions "[d]o you wish to reject Excess Uninsured Motorist Coverage" and "[d]o you wish to reject Excess Underinsured Motorist Coverage," as well as various state-specific forms explaining and offering such coverage pursuant to the laws of each state. (Dkt. No. 23-5). The generalized form reflects that Fellows answered 'yes' to both questions, and the state-specific forms reflect that he rejected coverage for each state for which it was offered. (*Id.*). No state-specific notices or offers to purchase coverage for New York or Indiana were included in the forms Fellows received in connection with the XSA Policy. (*Id.*).

C.    **The MMT Policy**

XPO also purchased another insurance policy from Defendant with the policy number MMT H2509721A (the "MMT Policy"), which, during the same policy period covered by the

XSA Policy, provided coverage for vehicles not covered by the XSA Policy, *i.e.* those "involved in intrastate operations . . . in the states of GA, KS, KY, MS and TX." (Dkt. No. 20-14, at 10, 60). The MMT Policy has a liability limit of $10 million per accident or loss, with a $3 million deductible. (*Id.* at 11, 53). Unlike the XSA Policy, under which Defendant has no obligation until XPO satisfies the $3 million Retained Amount, the MMT Policy provides that Defendant "will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' . . . to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto'," and also "will have the right and duty to defend any 'insured' against a 'suit' asking for such damages." (*Id.* at 24-25). XPO is then obligated to reimburse Defendant for any amounts paid up to the deductible amount. (*Id.* at 53).

As with the XSA Policy, the Fellows declaration states that Fellows was "authorized to sign automobile coverage selection/rejection forms on behalf of XPO" in connection with XPO's purchase of the MMT Policy, and attaches the "coverage selection/rejection forms for excess uninsured and excess underinsured motorist coverage that [Fellows] signed or received on or about September 29, 2017" in connection with the MMT Policy. (Dkt. No. 23-4, ¶¶ 2, 4). As with the XSA Policy, this set of forms includes a generalized form in which Fellows indicated his intent to reject uninsured and underinsured motorist coverage; however, the questions on this form are more numerous and detailed than on the form used in connection with the XSA Policy. (Dkt. No. 23-6, at 3).

Unlike the XSA Policy, this set of forms includes a form titled "Indiana Uninsured Motorists Coverage and Underinsured Motorists Coverage Selection/Rejection," which explains options for uninsured/underinsured motorists coverage and gives the insured the option to select or reject the coverage. (*Id.* at 4-8). The form indicates that Fellows rejected all offered types of

uninsured and underinsured motorist coverage on September 29, 2017. (*Id.* at 6, 8). Also unlike the XSA Policy, this set of forms contains a form titled "New York Required Notice of Availability of Supplementary Uninsured/Underinsured Motorists Coverage," which explains that the policy includes uninsured motorists coverage up to certain limits (as required by New York law) and gives the insured an option to purchase supplementary uninsured/underinsured motorists ("SUM") coverage. (*Id.* at 9-11). Unlike the Indiana form, the New York form only requires signature if the insured *elects* to purchase SUM coverage; it does not include a space for the insured to indicate their intent to *reject* SUM coverage. (*Id.* at 11). The form attached to the Fellows declaration is blank and unsigned. (*Id.*).

### D.    The Parties' Dispute

For purposes of the pending summary judgment motions, the parties do not dispute that the XSA Policy, and not the MMT Policy, covered the vehicle Plaintiff was driving at the time of his accident; that XPO is an "insured" under the XSA Policy; that Plaintiff was using XPO's covered "auto" with XPO's permission at the time of the accident, and therefore also qualifies as an "insured" under the XSA Policy; and that Plaintiff satisfied all the necessary prerequisites to bringing suit against Defendant for UM, UIM and/or SUM coverage. (Dkt. No. 20-23, ¶ 18; Dkt. No. 23-7, ¶ 18; Dkt. No. 23-1, at 8). The parties also do not dispute that, because the vehicle Plaintiff was driving was "registered" in Indiana and "principally garaged" in New York, both states' laws apply to disputes regarding the XSA Policy's UM, UIM and/or SUM coverage with respect to Plaintiff's claim. (Dkt. No. 23-1, at 12-13; Dkt. No. 20-22, at 3). The parties' core dispute is whether the XSA Policy's failure to provide UIM or SUM coverage for Plaintiff's claim (and Defendant's resulting denial of that claim) violated the laws of Indiana and/or New York.

### III.    STANDARD OF REVIEW

Under Rule 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir.2010))).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to

the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

When considering cross-motions for summary judgment, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Hotel Emp. & Rest. Emp. Union, Local 100 of New York, N.Y. & Vicinity v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002) (quoting *Heublein v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) (internal quotation marks omitted)).

## IV.   DISCUSSION

As noted above, the parties agree that, because the vehicle Plaintiff was driving was "registered" in Indiana and "principally garaged" in New York, both states' laws regarding UM, UIM and SUM coverage apply. *See* N.Y. Ins. Law § 3420(f)(1) (UM/SUM requirement applies to any auto policy "issued or delivered by any authorized insurer upon any motor vehicle . . . then principally garaged or principally used in this state . . ."); Ind. Code § 27-7-5-2(a) (UM/UIM requirement applies to "each automobile liability or motor vehicle liability policy of insurance which is delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state . . ."). While Indiana and New York law differ, and thus the arguments the parties advance with respect to each state's laws are distinct, the relief sought under each regime is the same. Specifically, Plaintiff asks this Court to find that the XSA

9

Policy's exclusion of UM, UIM and SUM coverage violates the laws of both states, and that under both regimes, the proper remedy is to find that, by operation of law, the XSA Policy provides such coverage in the amount of its bodily injury liability limit, *i.e.* $7 million. (Dkt. No. 20-22, at 3). Defendant argues that the XSA Policy fully complied with the laws of both states, that its denial of coverage for Plaintiff's claim was proper, and that the Court should therefore dismiss Plaintiff's claims in their entirety. (Dkt. No. 23-1, at 5-6).

### A.   Indiana Law

#### 1.   Indiana's UM/UIM Statute

The version of Indiana's uninsured/underinsured motorist statute in effect in October 2017,[5] Indiana Code § 27-7-5-2(a) (the "UM/UIM Statute"), provides, in relevant part:

> Sec. 2. (a) Except as provided in subsections (d), (f), and (h), the insurer shall make available, in each **automobile liability or motor vehicle liability policy of insurance** which is delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state, insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person and for injury to or destruction of property to others arising from the ownership, maintenance, or use of a motor vehicle, or in a supplement to such a policy, the following types of coverage:
>
> (1) in limits for bodily injury or death and for injury to or destruction of property not less than those set forth in IC 9-25-4-5 under policy provisions approved by the commissioner of insurance, for the protection of persons insured under the policy who are legally entitled to recover damages from owners or operators of uninsured or underinsured motor vehicles because of bodily injury, sickness or disease, including death, and for the protection of persons insured under the policy who are legally entitled to recover damages from owners or operators of uninsured motor vehicles for injury to or destruction of property resulting therefrom; or
>
> (2) in limits for bodily injury or death not less than those set forth in IC 9-25-4-5 under policy provisions approved by the commissioner of insurance, for the protection of persons insured under the policy provisions who are legally entitled to recover damages from owners or operators of uninsured or

---

[5] Indiana Code Ann. § 27-7-5-2 has been amended several times since October 2017, when the XSA Policy was issued and Plaintiff's accident occurred. *See* 2018 Ind. Legis. Serv. P.L. 208-2018, § 9; 2020 Ind. Legis. Serv. P.L. 130-2020, § 13. Both parties rely on, and the Court applies, the version of the statute that was in effect in October 2017.

> underinsured motor vehicles because of bodily injury, sickness or disease, including death resulting therefrom.
>
> The uninsured and underinsured motorist coverage **must be provided by insurers** for either a single premium or for separate premiums, **in limits at least equal to the limits of liability specified in the bodily injury provisions of an insured's policy, unless such coverages have been rejected in writing by the insured**.

Ind. Code § 27-7-5-2(a) (2013) (emphasis added). To summarize, the UM/UIM Statute provides that every "automobile liability or motor vehicle liability policy of insurance" that covers a vehicle "registered or principally garaged" in Indiana *must* include UM and UIM coverage "in limits at least equal to" the policy's "bodily injury" liability limits, unless the insurer obtains the insured's affirmative rejection of such coverage in writing. (*Id.*).

The UM/UIM Statute exempts certain types of policies from its requirements. These exemptions have been revised several times, but the relevant exemption that was in effect in October 2017 reads as follows:

> (d) An insurer is not required to make available the coverage described in subsection (a) in a **commercial umbrella or excess liability policy,** including a commercial umbrella or excess liability policy that is issued or delivered to a motor carrier (as defined in IC 8-2.1-17-10) that is in compliance with the minimum levels of financial responsibility set forth in 49 CFR Part 387.

Indiana Code § 27-7-5-2(d) (2013). The legislature has never defined "commercial umbrella or excess liability policy" for purposes of this exemption.

### 2.    Analysis

For purposes of the pending motions, there is no dispute that the XSA Policy, which governs Plaintiff's claim, does not include the coverage mandated by the UM/UIM Statute, and that Defendant did not obtain the required express rejection of this coverage in writing from

XPO.[6] The question at issue is whether the XSA Policy is a "commercial excess liability policy"[7] and thus exempt from the UM/UIM Statute's requirements. Defendant argues that the XSA Policy, which provides coverage only after exhaustion of a $3 million self-insured "Retained Limit," is an "excess" policy within the ordinary meaning of that term, and therefore falls within the statutory exemption. (Dkt. No. 23-1, at 14-21; Dkt. No. 28, at 5-7). Plaintiff argues that the XSA Policy operates as XPO's first layer of insurance coverage for vehicles registered or principally garaged in Indiana, and that its inclusion of a self-insured "Retained Limit" does not convert it into the type of "excess" policy contemplated by the legislature. (Dkt. No. 20-22, at 3-19; Dkt. No. 27, at 2-10). Both parties present various arguments from the terms of the XSA Policy, the statutory text, the exemption's legislative history, and evidence of how the term "commercial excess liability policy" is used in the insurance industry to support their respective positions. (Dkt. No. 20-22, at 3-19; Dkt. No. 23-1, at 14-21; Dkt. No. 27, at 2-10; Dkt. No. 28, at 5-7).

   As an initial matter, an examination of the XSA Policy itself does not answer this question. The XSA Policy is labeled as an "excess" policy (but not a "commercial excess liability" policy) in several places, (Dkt. No. 20-15, at 28, 39); it does not apply unless and until a self-insured Retained Limit is exhausted, (*id.* at 39); it does not apply to litigation expenses,

---

[6] Defendant does not argue that either Fellows' generalized rejection of UM and UIM coverage in connection with the XSA Policy, (Dkt. No. 23-5, at 3), or his explicit Indiana-specific rejection of UM and UIM coverage in connection with the MMT Policy, (Dkt. No. 23-6, at 4-8), constitutes the written rejection Indiana law requires. Such an argument would appear to contradict the plain language of the XSA Policy, which states that "[n]o [UM or UIM] coverage is **offered** or provided for vehicles principally garaged or registered in [Indiana]." (Dkt. No. 20-15, at 25 (emphasis added)). Defendant *does* argue that this evidence (together with other evidence that Fellows rejected UM and UIM coverage with respect to every state for which it was offered) demonstrates Fellows' intent to broadly reject UM and UIM coverage, and establishes unequivocally that he would have rejected the coverage for Indiana had it been offered. (Dkt. No. 23-1, at 21). Even if true, that is of no moment, as Indiana's statute requires that an insurer either provide such coverage or obtain the insured's express written rejection.

[7] No party argues that the XSA Policy could be considered an "umbrella" policy for purposes of the exemption.

(*id.*); and it gives Defendant the right, but not the obligation, to assume the defense of suits

seeking damages likely to exceed the Retained Limit, (*id.*). At the same time, unlike a traditional

"commercial excess" policy, which provides coverage in an amount beyond the limits specified

in a primary, first-layer insurance policy, the XSA Policy's plain language does not require, or

even contemplate, that the insured maintain a primary, first-layer insurance policy other than the

self-insured Retained Limit. Because there is no anticipated underlying insurance policy, unlike a

traditional "commercial excess" policy that incorporates the underlying policy's scope of

coverage, the XSA Policy contains detailed provisions outlining its scope of coverage, much like

a typical primary insurance policy would. (*Compare id.* at 39-51 *with* Dkt. No. 20-21, at 1, 5, 6-7

(standardized "commercial excess liability coverage" form with provisions requiring underlying

insurance and limiting scope of coverage to that of the underlying insurance policy)).[8] Therefore,

while the XSA Policy is styled as an "excess" policy, it is unclear whether it is the type of

"commercial excess liability policy" exempted from the UM/UIM Statute.

The Court's task, then, is to determine whether the Indiana legislature's use of the term

"commercial excess liability policy" in the UM/UIM Statute's exemption is meant to encompass

a policy with the specific features of Defendant's XSA Policy—most crucially, the fact that it is

"excess" only of a self-insured Retained Limit, and does not require or contemplate any other

underlying, first-layer insurance coverage. This presents a pure legal question regarding the

---

[8] The only place in which the XSA Policy contemplates the possibility that the insured will have additional first-layer insurance coverage is in its "other insurance" clause, a type of clause which is "commonly contained in primary policies and providing coverage only in excess of any other primary policy." *Nat. Union Fire Ins. Co. v. Glenview Park Dist.*, 230 Ill. App. 3d 578, 589 (Ill. Ct. App. 1992); *see also St. Paul Mercury Ins. Co. v. Lexington Ins. Co.*, 78 F.3d 202, 206-10 (5th Cir. 1996) (describing "other insurance" clauses as "generally designed by insurers to 'avoid an insured's temptation or fraud of over-insuring . . . property or inflicting self-injury,'" and analyzing priorities of several policies with such clauses); *Bovis Lend Lease LMB, Inc. v. Great Am. Ins. Co.*, 855 N.Y.S.2d 459, 465-72 (1st Dep't 2008) (discussing, *inter alia*, "other insurance" provisions in two umbrella policies and a third policy which was "not a true excess policy, but a primary policy that, under certain circumstances, purports to shift losses to other available insurance"). Neither party argues that the "other insurance" clause's existence supports their interpretation of the XSA Policy.

proper interpretation of an Indiana statute, on which the Indiana Supreme Court has not yet

spoken.[9] "[I]n the absence of authoritative law from the state's highest court," the Court "must

either (1) predict how the [Indiana Supreme Court] would resolve the state law question, or, if

state law is so uncertain that" the Court cannot make a "reasonable prediction, (2) certify the

question to the [Indiana Supreme Court] for a definitive resolution." *DiBella v. Hopkins*, 403

F.3d 102, 111 (2d Cir. 2005); *see also* Ind. R. App. P. 64 ("[A]ny federal district court may

certify a question of Indiana law to the Supreme Court [of Indiana] when it appears to the federal

court that a proceeding presents an issue of state law that is determinative of the case and on

which there is no clear controlling Indiana precedent."). The parties do not argue that

certification is warranted in this case, and given that the certification procedure should only be

used in "exceptional circumstances," the Court will "undertake the imprecise but necessary task

of predicting on a reasonable basis how the [Indiana Supreme Court] would rule if squarely

confronted with this issue." *Id.* at 111-12.

　　"Indiana courts employ the basic tools of statutory interpretation: Statutes are read as a

whole, and words are given their plain and ordinary meaning." *Frye*, 845 F.3d at 786 (citations

omitted). "If a statute is unambiguous, that is, susceptible to but one meaning, [the Court] must

give the statute its clear and plain meaning." *Bolin v. Wingert,* 764 N.E.2d 201, 204 (Ind. 2002)

---

[9] Moreover, other Indiana state and federal court cases interpreting Indiana Code § 27-7-5-2(d) (or its predecessors and successors) have not spoken to the question at issue. *See, e.g., Frye v. Auto-Owners Ins. Co.*, 845 F.3d 782, 785-87 (7th Cir. 2017) (finding that the exemption does not allow commercial umbrella liability insurers who *choose* to provide UIM coverage to do so in amounts lower than their policies' general limits of liability for bodily injury); *Fireman's Fund Ins. Co. v. Ackerman*, 56 N.E.3d 1209, 1210-15 (Ind. Ct. App. 2016) (finding that the exemption applied to both newly-issued policies and renewal policies); *Empire Fire v. Frierson*, 49 N.E.3d 1075, 1081-82 (Ind. Ct. App. 2016) (finding that an insurance policy accompanying a car rental agreement was unambiguously an "excess" policy within the meaning of the exemption based on its requirement that the policyholder  maintain "underlying insurance" in the form of an insurance policy, bond, cash deposit or self-insurance as a condition precedent to coverage); *Ohio Cas. Ins. Co. v. Herring-Jenkins*, 830 F. Supp. 2d 566, 582-84 (N.D. Ind. 2011) (finding that the "clear language" of the 2009 amendments to § 27-7-5-2(d) did not require UM coverage in a commercial umbrella policy that was in effect prior to the amendments' effective date).

(citations omitted). "If a statute is susceptible to multiple interpretations, however, [the Court] must try to ascertain the legislature's intent and interpret the statute so as to effectuate that intent." *Id.* The Court "presume[s] the legislature intended logical application of the language used in the statute, so as to avoid unjust or absurd results." *Id.*

As noted, the UM/UIM Statute does not define the term "commercial excess liability policy." "When the legislature has not defined a word, we give the word its common and ordinary meaning . . . In order to determine the plain and ordinary meaning of words, courts may properly consult English language dictionaries." *Butrum v. Roman*, 803 N.E.2d 1139, 1145 (Ind. Ct. App. 2004), *abrogated by Hirsch v. Oliver*, 970 N.E.2d 651 (Ind. 2012) (citation omitted). While Black's Law Dictionary does not define "commercial excess liability policy," it does define "excess insurance" and "excess policy" as "[a]n agreement to indemnify against any loss that exceeds the amount of coverage under *another policy*." INSURANCE, Black's Law Dictionary (11th ed. 2019) (emphasis added). This definition arguably supports Plaintiff's narrower construction of the term "commercial excess liability policy," which encompasses only policies that are "excess" over other, primary policies. However, Defendant argues that the term "commercial excess liability policy" must necessarily be read to include policies like the XSA Policy, which is not only styled as an "excess" policy but, as discussed above, has some characteristics of a traditional "excess" policy in that it gives the insurer no obligation until a self-insured retention is exhausted. Because, on its face, the term "commercial excess liability policy" is "susceptible to multiple interpretations," the Court proceeds to "try to ascertain the legislature's intent and interpret the statute so as to effectuate that intent." *Bolin,* 764 N.E.2d at 204.

15

The Indiana Supreme Court has often discussed the legislative intent underlying the UM/UIM Statute. In 1999 (before the exemption at issue in this case was enacted), the Indiana Supreme Court held that the phrase "automobile liability or motor vehicle liability policy of insurance," as used in the UM/UIM Statute, included not only primary insurance policies, but also included "commercial umbrella liability insurance policies" that "combine more than one type of liability insurance in a single policy, serving as comprehensive excess insurance that 'insur[es] the policy holder in general rather than a particular automobile within the state.'" *United Nat. Ins. Co. v. DePrizio*, 705 N.E.2d 455, 459 (Ind. 1999) (record citation omitted). In reaching this conclusion, the court began from the premises that UM and UIM coverage "serve[s] to promote the recovery of damages for innocent victims of auto accidents with uninsured motorists," that "[g]iven the remedial nature of these objectives, uninsured/underinsured motorist legislation is to be liberally construed," and that "like all statutes relating to insurance or insurance policies, uninsured/underinsured motorist statutes are to be read in a light most favorable to the insured." *Id.* at 459-60. Examining the language and legislative history of Indiana's UM/UIM Statute, the court concluded that the Indiana legislature intended the statute to be a "full recovery" statute, *i.e.* one that "give[s] insureds the opportunity for full compensation for injuries inflicted by financially irresponsible motorists." *Id.* at 461.[10] The court thus found that "to the extent an umbrella policy provides coverage for loss resulting from liability to third parties for bodily injury, death or property damage arising from the

---

[10] The court contrasted Indiana's "full recovery" statute with other jurisdictions' "minimum liability" statutes, which mandate only that insurers provide UM and UIM coverage at "minimum levels, usually the amount required by a state's financial responsibility law." *Id.* at 461. The court observed that some courts in jurisdictions with such statutes found that they "do not require that umbrella policies provide uninsured and underinsured coverage" because "the legislative purpose of these statutes is satisfied when policies compensate the victim to the same extent as they would have been had the tortfeasor complied with the minimum requirements of the state's financial responsibility laws." *Id.* at 461-62. The court found that, by contrast, given the "full recovery" purpose of Indiana's UM/UIM Statute, its definition of "automobile liability or motor vehicle liability policy of insurance" warranted a broader construction more protective of insureds. *Id.*

ownership, maintenance or use of a motor vehicle, it should not escape the reach of the statute simply because it covers additional types of liability as well," and that a contrary conclusion would "contravene" the statute's "full recovery" purpose. *Id.* at 461, 464. The court therefore held that, "[a]bsent an express directive from our legislature, we decline the invitation to carve out an exemption [from the UM/UIM Statute] for particular policies." *Id.* at 463. The legislature did ultimately create such an "express directive" by creating certain statutory exemptions, which ultimately evolved into the exemption at issue in this case.[11]

*DePrizio* makes clear that the UM/UIM Statute must be interpreted in light of the legislature's intention to create "a mandatory coverage, full-recovery, remedial statute" which is to be "considered a part of every automobile liability policy the same as if written therein." *United Nat. Ins. Co.,* 705 N.E.2d at 460. The statute must be construed in light of its purpose " to give the insured the recovery he or she would have received if the underinsured motorist had maintained an adequate policy of liability insurance." *Corr v. Am. Family Ins.,* 767 N.E.2d 535, 540 (Ind. 2002). Since *DiPrizio*, Indiana courts have reiterated that the legislature's intent in enacting the UM/UIM Statute was to:

> give insureds the opportunity for full compensation for injuries inflicted by financially irresponsible motorists. Due to the remedial nature of this type of coverage, underinsured motorist legislation is to be liberally construed, and similar to all insurance statutes and policies, is to be read in a light most favorable to the insured.

*State Farm Mut. Auto Ins. Co. v. Sellers*, 854 F. Supp. 2d 609, 619 (N.D. Ind. 2012) (quoting *Masten v. AMCO Ins. Co.,* 953 N.E.2d 566, 570 (Ind. Ct. App. 2011)). In keeping with this

---

[11] In 2005, the legislature enacted a broader exemption that applied to policies insuring any type of business and commercial vehicle, *see* 2005 Ind. Legis. Serv. P.L. 72-2005, §1, but in 2009, the exemption was limited to commercial excess and umbrella liability policies only, *see* 2009 Ind. Legis. Serv. P.L. 124-2009, § 1. While the UM/UIM Statute was amended several times between 2009 and 2017, no relevant changes were made to § 27-7-5-2(d). *See* 2011 Ind. Legis. Serv. P.L. 116-2011, § 2; 2012 Ind. Legis. Serv. P.L. 125-2012, § 403; 2013 Ind. Legis. Serv. P.L. 148-2013, § 1.

principle, any "ambiguity" in the terms of the UIM/UIM Statute must be "resolved in favor of the insured." *Lakes v. Grange Mut. Cas. Co.*, 964 N.E.2d 796, 804-05 (Ind. 2012).

In addition to looking to the general purpose of the UM/UIM Statute, the Court looks to whether Indiana case law in existence at the time the legislature enacted the relevant exemption resolves the ambiguity regarding its use of the term "commercial excess liability policy." On this point, Defendant asserts that "Indiana appellate courts have long recognized that insurance policies with significant self-insured retentions are umbrella policies or excess liability policies, if that is what the policy's language says." (Dkt. No. 23-1, at 16). However, of the cases Defendant cites for support, the only one that mentions the UM/UIM Statute cautions that jurisprudence interpreting the UM/UIM Statute has "focused intently upon the particular language, purposes, and history of" that statute, and suggests that the use of a particular term in the context of a different statute or legal question is not necessarily dispositive on how that term should be read in the context of the UM/UIM Statute. *Monroe Guar. Ins. Co. v. Langreck*, 816 N.E.2d 485, 497 (Ind. Ct. App. 2004) (finding that *DePrizio*'s conclusion that the UM/UIM Statute's definition of "automobile liability policy or motor vehicle liability policy" includes umbrella policies is, "at best, only marginally relevant to the issue before us concerning a completely different statute" and "cannot be translated wholesale into a conclusion that an umbrella insurance policy is also necessarily 'motor vehicle insurance coverage' for purposes of" a different statute).

None of the cases Defendant relies on address the question at issue: whether the term "excess" *as used in the UM/UIM Statute* encompasses a policy that is "excess" over a self-insured retention, where no other underlying insurance exists or is contemplated by the policy. Nonetheless, the cases are somewhat instructive, in that they suggest that policies that are

"excess" over a self-insured retention are conceptually analogous to policies that are "excess" over an underlying insurance policy. *See Monroe Guar. Ins. Co.*, 816 N.E.2d at 494-96 (finding policy that applied "excess of a retained amount," defined as "the amount retained by the Insured [as self-insurance] or the amount of underlying insurance for damages," was an "umbrella or true excess policy" over another insurance policy that was "a primary policy that purports to be excess only in limited circumstances," and in so finding, explaining the distinction between self-insurance retentions like the excess policy's $1 million "retained amount" and deductibles that are often found in primary policies); *Trinity Homes LLC v. Ohio Cas. Insu. Co.*, No. 04-cv-1920, 2007 WL 1021825, at *15, 2007 U.S. Dist. LEXIS 24370, at *48-49 (S.D. Ind. Mar. 30, 2007) (observing that a self-insured retention "effectively transforms the policy from a primary policy into an excess policy" in the sense that the insurer has no duty to defend until the self-insured retention has been exhausted); *Cinergy Corp. v. Associated Elec. & Gas Ins. Servs., Ltd.*, 865 N.E.2d 571, 573 n.3 (Ind. 2007) (noting in dicta that the policies at issue provided "excess coverage" over self-insured retentions); *Allianz Ins. Co. v. Guidant Corp.*, 884 N.E.2d 405, 417-23 (Ind. Ct. App. 2008) (addressing legal issues related to when an insurer's duty to defend is triggered with respect to a policy containing a self-insurance retention).

The distinction, however, between insurance that is excess over an underlying insurance policy and insurance that is excess over a self-insured retention is a significant one for the purposes of the UM/UIM Statute. As Plaintiff points out, Indiana appellate courts have observed that self-insurance is "not insurance at all" and is, in fact, the "antithesis of insurance," which is distinguished from other forms of insurance by the fact that "the risk of loss is assumed by the self-insured entity; it is not shared among a group of entities." *Eakin v. Indiana Intergovernmental Risk Mgmt. Auth.*, 557 N.E.2d 1095, 1098 (Ind. Ct. App. 1990) (citing

*American Nurses Ass'n v. Passaic Gen. Hosp*, 471 A.2d 66, 69 (N.J. Super. Ct. App. Div. 1984)); *see also Allianz Ins. Co.*, 884 N.E.2d at 410 n.2 (analogizing a self-insurance retention to a deductible). Notably for purposes of the current dispute, the Indiana Supreme Court has relied on this distinction to find that self-insurers are not "insurers," and that self-insurance policies are not "policies of insurance," within the meaning of the UM/UIM Statute. *City of Gary v. Allstate Ins. Co.*, 612 N.E.2d 115, 116-19 (Ind. 1993), *abrogated by statute on other grounds as recognized in United Nat. Ins. Co.*, 705 N.E.2d at 460-61; *cf. Northern Indiana Pub. Service Co. v. Bloom*, 847 N.E.2d 175, 183-86 (Ind. 2006) (finding that Indiana's Financial Responsibility Act "does not make a self-insurer a quasi-insurance carrier and require it to indemnify a permissive user," in contrast to a contractual insurance provider).

This case law suggests that, at least for purposes of the UM/UIM Statute, a policy that is "excess" over only a self-insured retention could be viewed as conceptually—and legally— distinct from a policy that is "excess" over an actual insurance policy. The legislature expressly contemplated that the UM/UIM Statute would exempt "excess" policies whose insured already has an underlying primary policy that complies with the UM/UIM Statute's requirements. A different subsection of the UM/UIM Statute, added in 2009 at the same time as subsection (d), makes this clear, providing that a rejection of UM/UIM coverage "in an underlying commercial policy of insurance is also a rejection" of UM/UIM coverage "in a commercial umbrella or excess liability policy." Indiana Code § 27-7-5-2(e) (2013). Thus, under the statutory scheme enacted by the legislature, those who purchase both a primary policy and an excess policy are protected by the UM/UIM Statute, since their primary insurer is required to offer them UM/UIM coverage or receive their written rejection. By contrast, because Indiana law exempts self-insurers from the UM/UIM Statute's requirements, reading the exemption from the statute to

apply to policies that are "excess" only over a self-insured retention would leave the insured completely without the UM/UIM Statute's protections. Such a result would be in tension with the legislature's goal of creating "a mandatory coverage, full-recovery, remedial statute" that provides insureds with broad protection against irresponsible motorists. *United Nat. Ins. Co.,* 705 N.E.2d at 460.

Given all this, a review of the foregoing case law—all of which was in existence in 2009, when the relevant version of § 27-7-5-2(d) was enacted— does not resolve the question of whether the Indiana legislature intended the term "commercial excess liability policy" to encompass policies like the XSA Policy.[12]

Further muddying the waters is the evidence Plaintiff has proffered about the common use of the term "commercial excess liability policy" in the vehicle insurance industry. Plaintiff submits an affidavit by Patricia Oot,[13] a witness with specialized skill and knowledge in that industry, to opine on this issue. (Dkt. No. 20-20). Importantly, questions about "the meaning of

---

[12] Treatises on insurance law are similarly ambiguous as to whether a policy that is excess only of a self-insured retention, and for which no underlying primary insurance policy exists, is a true "excess" policy. *Compare, e.g.,* Couch on Ins. § 219:24 Excess Policy ("A true excess policy is one whose coverage is conditioned upon the existence of a primary policy and whose coverage does not begin until a loss exceeds a stated level, usually the level of primary insurance that the insured commits to maintaining."); *with, e.g., id.* § 200:27 Trigger of Duty ("When a policy is subject to a self-insured retention (SIR), the insurer is more like an excess insurer and the insurer's duty to defend and indemnify is not triggered until the SIR is exhausted.").

[13] Citing Fed. R. Civ. P. 56(c)(2) and (4), Defendant states that "[t]he Court should not consider Ms. Oot's affidavit because the statements contained in it are not admissible witness testimony," but does not expand on that argument. (Dkt. No. 23-1, at 20; *see also* Dkt. No. 28, at 6 n. 2). "Issues mentioned in a perfunctory manner, unaccompanied by some effort at developed argumentation are deemed waived." *Lyn v. Inc. Vill. of Hempstead*, No. 03-cv-5041, 2007 WL 1876502, at *16 n.13, 2007 U.S. Dist. LEXIS 46957, at *52-53 n.13 (E.D.N.Y. June 28, 2007). Defendant has offered no rebuttal to the contention that Oot's experience in the insurance industry, as set forth in her affidavit, (Dkt. No. 20-20, ¶ 1), qualifies her to opine on the subjects that her affidavit covers. Nor does Defendant offer any reason why the fact that Oot's testimony is presented in the form of an affidavit bars the Court's consideration of her analysis. *See* Fed. R. Civ. P. 56(c)(4) (allowing affidavits to be used to support or oppose a summary judgment motion so long as they are "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated"); *Smith v. City of New York*, 697 F. App'x 88, 89 (2d Cir. 2017) ("[M]aterial relied on at summary judgment need not be admissible in the form presented to the district court. Rather, so long as the evidence in question will be presented in admissible form at trial, it may be considered on summary judgment." (internal quotation marks omitted)). Defendant raises no other specific challenges to the admissibility of Ms. Oot's testimony.

the statute and regulations" are "a subject for the court, not for testimonial experts," *U.S. v. Caputo*, 517 F.3d 935, 942 (7th Cir. 2008), and therefore Oot's opinions are not determinative of the proper interpretation of the UM/UIM Statute. However, the Court may consider Oot's affidavit for the purpose of determining whether the term "commercial excess liability policy" has a "specific, precise meaning" in the insurance industry that may inform the Court's construction of that term. *Higgins v. State*, 855 N.E.2d 338, 342-43 (Ind. Ct. App. 2006) (observing that a "term of art" is "[a] word or phrase having a specific, precise meaning in a given specialty," and that "[e]vidence of industry practice is admissible to construe terms of art" in a statute (citing *Allstate Ins. Co. v. Dana Corp.*, 759 N.E.2d 1049, 1059 (Ind. 2001))); *see also Johnson Cnty. Farm Bureau Co-op Ass'n, Inc. v. Indiana Dep't of State Rev.*, 568 N.E.2d 578, 584 (Ind. T.C. 1991) (stating that "words in a statute expressed in technical terms should be construed to have the same meaning as that commonly understood by the particular industry addressed," and interpreting the word "cost" in the Indiana Grain Dealer Statute "to comport with the generally understood meaning of 'cost' within the grain dealer industry, the industry's GAAP standards, and the industry's external financial reporting method"); *Indiana Dep't of State Rev. v. Food Marketing Corp.*, 403 N.E.2d 1093, 1096-97 (Ind. Ct. App. 1980) (affirming trial court's construction of the term "cost of stock sold" in a statute based on "substantial evidence" of the term's use in the accounting profession and the food distributing industry).

In her affidavit, Oot distinguishes between: (1) "[t]raditional 'Excess Liability' insurance," which "provides limits that exceed the underlying liability policy" and is "no broader concerning the incidents covered by the underlying insurance, meaning it will not expand the stated coverage but will provide higher limits on top of the underlying policy"; (2) policies with a self-insured retention, which is "a dollar amount specified in a liability insurance policy that

must be paid by the insured before the insurance policy will respond," and is "not insurance," but rather "the opposite of insurance"; and (3) policies with a deductible, in which "the insurer usually pays the defense and indemnity costs associated with a claim on the insured's behalf and then seek reimbursement of the deductible payment from the insured." (*Id.* ¶¶ 4, 8-10). Applying these definitions, Oot opines that the XSA Policy "does not provide traditional 'excess' coverage because there was no underlying or primary insurance coverage." (*Id.* ¶ 7). She observes that the XSA Policy uses a standard form promulgated by the Insurance Services Office ("ISO") titled "Excess Business Auto Coverage Form," which "pays claims and defense in excess of the per claim 'retained limit,'" and contrasts it with a different ISO form titled "Commercial Excess Liability Coverage Form," which "provides traditional Excess Liability coverage" by "provid[ing] 'excess' coverage over a specific insurance policy." (*Id.* ¶¶ 2, 7, 11-12). To explain the use of the phrase "excess" in the "Excess Business Auto Coverage Form," Oot concedes that "ISO has expanded its use of the term 'excess' to include policies with [self-insured retentions]," but states that "[t]his is a specialized definition of the term 'excess' used in a small segment of the insurance market, and not the commonly accepted use of the phrase 'Commercial Excess Liability Coverage.'" (*Id.* ¶ 13).

Oot's analysis suggests two possible meanings for the term "commercial excess liability policy" as used in the UM/UIM Statute: (1) a "traditional" excess liability policy, which would not include the XSA Policy, and (2) ISO's more expansive, "specialized" definition of "excess," which would. As to which meaning the Indiana legislature intended, Oot's affidavit establishes that ISO has a standard form with a title that matches the exact term used by the legislature in the UM/UIM Statute's exemption—"commercial excess liability"—and that this form provides "traditional" excess liability coverage, while the XSA Policy uses a *different* form with a

different title. This could constitute some evidence suggesting that the term "commercial excess liability policy," as used in the UM/UIM Statute, is intended to cover only "traditional" excess liability policies and not policies like the XSA Policy. However, Oot's affidavit does not make clear whether these same forms with the same terminology were in use at the time the relevant version § 27-7-5-2(d) was enacted. As to the recent expansion in ISO's use of the term "excess" she describes, Oot's affidavit does not clarify when that expansion occurred or, specifically, whether that shift in terminology happened before or after the relevant version of the UM/UIM Statute was enacted. In any event, while Oot's affidavit does not resolve the question of which meaning the legislature had in mind when writing § 27-7-5-2(d), it does lend credence to Plaintiff's view that the legislature *could* have intended the term to exclude policies like the XSA Policy, confirming the inherent ambiguity in the statute.[14]

The parties make several other arguments regarding the proper interpretation of the UM/UIM Statute, none of which are particularly persuasive. For example, Plaintiff points to statutes from several other states that more specifically provide exemptions from their UM/UIM requirements for any policy that "does not provide primary motor vehicle insurance," observes that "none of these states included self insured retention in the definition of 'primary' insurance," and argues that this evidences the Indiana legislature's intention not to include self-insured retainage when codifying a similar exemption. (Dkt. No. 20-22, at 17). But even if Plaintiff's

---

[14] Plaintiff also submits as evidence the certificate of insurance for the XSA Policy, noting that it identifies the XSA Policy as "automobile liability coverage" rather than as an "umbrella or excess liability" policy. (Dkt. No. 20-22, at 13 (citing Dkt. No. 20-16)). With his reply brief, Plaintiff also submits a second affidavit from Oot, which offers her analysis regarding the significance of that distinction. (Dkt. No. 27-1). The parties have various disagreements regarding the certificate of insurance and its relevance to the question before the Court. (Dkt. No. 23-1, at 20-21; Dkt. No. 27, at 8-9; Dkt. No. 28, at 5-6). Even if the Court were to consider the certificate of insurance, the Court's conclusion would not change; rather, as the parties' arguments highlight, the certificate of insurance only further contributes to the ambiguity the Court has already found from the relevant statutory text, and the case law and other evidence discussed. Therefore, the Court need not consider the certificate of insurance or address the parties' arguments regarding it.

interpretation of these statutes is correct (which is not clear from the statutes' plain language), they are of little value in construing Indiana's UM/UIM Statute, which does not include the clarifying language Plaintiff relies on.

As another example, Defendant notes the fact that the exemption as passed in 2005 included *any* policy insuring a business or commercial vehicle, but that it was amended in 2009 to apply only to umbrella and excess liability policies, and that when revising the policy, the legislature could have made clear that § 27-7-5-2(d) did not apply to policies with self-insured retentions if that was its intention. (Dkt. No. 23-1, at 19-20). But the fact that the Indiana legislature originally created a broader exemption, and later narrowed it, sheds no light on whether it intended policies like the XSA Policy to be included in the narrower exemption. Furthermore, as the Indiana Supreme Court has made clear, motor vehicle insurance policies must be presumed to be *included* in the UM/UIM Statute's reach in the absence of an "express directive" from the legislature. *United Nat. Ins. Co.,* 705 N.E.2d at 463. As a corollary, where there is no "express directive" that applies to the policy at issue (or where, as here, the directive is ambiguous as to whether it includes the policy), the policy must be presumed to be subject to the UM/UIM Statute's requirements (and thus, not captured by the ambiguously worded exemption). Defendant's argument appears to argue for the opposite approach.

Given the ambiguity in the UM/UIM Statute's definition of "commercial excess liability policy," the absence of any legislative history or other extrinsic evidence resolving that ambiguity, and the lack of any case law from the Indiana courts squarely addressing the question, the Court is obligated to follow the Indiana Supreme Court's mandate to construe the UM/UIM statute "liberally," read it in the "light most favorable to the insured," *United Nat. Ins. Co.*, 705 N.E.2d at 459-60, and "resolve[ statutory ambiguities] in favor of the insured," *Lakes*, 964

N.E.2d at 804-05. As such, the Court finds that the XSA Policy was required to either provide the mandated UM/UIM coverage or obtain XPO's written rejection of that coverage. The statutory language does not explicitly exempt policies like the XSA Policy from the UM/UIM Statute's reach, but rather merely uses the ambiguous term "commercial excess liability policy." Therefore, the Court's conclusion is consistent with the Indiana Supreme Court's pronouncement that, "[a]bsent an express directive from [the Indiana] legislature," courts should "decline the invitation to carve out an exemption [from the UM/UIM Statute] for particular policies." *United Nat. Ins. Co.*, 705 N.E.2d at 463. The Court's conclusion is also consistent with the remedial purpose of the UM/UIM Statute which, as the Indiana Supreme Court and other courts in Indiana have often emphasized, is to "give[s] insureds the opportunity for full compensation for injuries inflicted by financially irresponsible motorists." *United Nat. Ins. Co.*, 705 N.E.2d at 461; *see also Schweihs v. State Farm Mut. Automobile Ins. Co.*, No. 18-cv-140, 2020 WL 1515087, at *7-8, 2020 U.S. Dist. LEXIS 54799, at *18-20 (N.D. Ind. Mar. 30, 2020); *Justice v. Am. Family Mut. Ins. Co*, 4 N.E.3d 1171, 1178 (Ind. 2014); *Lakes*, 964 N.E.2d at 804-05; *Cincinnati Ins. Co. v. Trosky*, 918 N.E.2d 1, 9-10 (Ind. Ct. App. 2009); *State Farm Mut. Auto. Ins. Co. v. Jakupko*, 881 N.E.2d 654, 660-62 (Ind. 2008); *Elliott v. Allstate Ins. Co.*, 881 N.E.2d 662, 664-65 (Ind. 2008).

As noted above, a finding to the contrary would lead to an anomalous result. Where an insurance policy is "excess" over an underlying, primary liability policy, the insured does not lose the protection of the UM/UIM Statute and its "full recovery" purpose, because the underlying primary liability policy is required to comply with that statute. However, under Defendant's interpretation of the UM/UIM Statute, insureds such as Plaintiff—whose only insurance policy is one that is "excess" over a self-insured retention, and for whom the self-

insured retention provides the *only* form of primary liability insurance—could be deprived of all

of the UM/UIM Statute's protections, since self-insurers do not have to comply with the statute

and, under Defendant's reading, neither would the "excess" insurer. *City of Gary v. Allstate Ins.*

*Co.*, 612 N.E.2d at 116-19. Absent an explicit directive from the legislature[15] or the Indiana

courts, and in light of the UM/UIM Statute's purpose of providing broad protections to insureds,

the Court declines to read the UM/UIM Statute to create such an inconsistency with respect to

the protections available to insureds.

Because the XSA Policy, by its plain terms, did not offer or provide UM or UIM

coverage as required by law, its exclusion of that coverage is "unlawful and unenforceable." *See*

*Justice*, 4 N.E.3d at 1177-79 ("So long as the policy language comports with our state statutes, it

will control, but if it is inconsistent with those statutes, it is unenforceable" (citations omitted)).

Moreover, in the absence of an explicit written rejection of the coverage by the insured, the

requirements of the UM/UIM Statute must be "considered a part of every automobile liability

policy the same as if written therein." *United Nat. Ins. Co.,* 705 N.E.2d at 460. The UM/UIM

Statute provides that UM and UIM coverage must be provided "in limits at least equal to the

limits of liability specified in the bodily injury provisions of an insured's policy." Ind. Code §

27-7-5-2(a). Thus, under Indiana Law, the XSA Policy must be read to provide UM and UIM

coverage in limits equal to its bodily injury limits of liability, *i.e.* $7 million.[16] As such, the Court

---

[15] As Defendants point out, the UM/UIM Statute did at one time contain just such an explicit directive, exempting *all* commercial vehicle liability insurance policies from the statute's requirements. (Dkt. No. 23-1, at 19-20). But that broader exemption was repealed and is not applicable to Plaintiff's claims. (*Id.*).

[16] Plaintiff has offered no support for his contention that the "liability limit of $7,000,000 per accident . . . [is] in excess of the underlying State Farm policy of $50,000," (Dkt. No. 20-22, at 2), despite the fact that the $7,000,000 "limit[]" of liability specified in the bodily injury provisions of" the XSA Policy, Ind. Code § 27-7-5-2(a), is in excess of a $3,000,000 self-insured retention. The parties have not briefed, and the Court does not address, that issue.

grants Plaintiff's motion for summary judgment, and denies Defendant's motion for summary judgment, on this question.

### B.    New York Law

#### 1.    Interpretation of Insurance Policies Under New York Law

Under New York law, courts interpret insurance policies like any other contract, *J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.*, 21 N.Y.3d 324, 334 (2013), giving unambiguous provisions of a policy their "plain and ordinary meaning," *White v. Cont'l Cas. Co.*, 9 N.Y.3d 264, 267 (2007). Ambiguity, where found, must be resolved in favor of the insured. *In re Viking Pump, Inc.*, 27 N.Y.3d 244, 257-58 (2016). A policy is ambiguous if the language "could suggest 'more than one meaning when viewed objectively by a reasonably intelligent person who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or business.'" *Int'l Multifoods Corp. v. Commercial Union Ins.*, 309 F.3d 76, 83 (2d Cir. 2002) (quoting *Morgan Stanley Grp. Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000)). "[A] contract is not ambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion." *In re Viking Pump, Inc.*, 27 N.Y.3d at 258 (alteration in original) (internal quotation marks omitted).

#### 2.    New York's UM and SUM Statutes

The version of New York's UM statute applicable to Plaintiff's claims[17] requires all insurance policies covering vehicles "principally garaged or principally used" in New York to provide UM insurance up to statutorily specified maximums. N.Y. Ins. Law § 3420(f)(1) (2013).

---

[17] Both parties rely on, and the Court applies, the version of the UM Statute that was in effect at the time the XSA Policy was issued and Plaintiff's accident occurred.

The mandatory UM coverage applies to specified categories of damages the insured is entitled to recover from:

> an owner or operator of an uninsured motor vehicle, unidentified motor vehicle which leaves the scene of an accident, a motor vehicle registered in this state as to which at the time of the accident there was not in effect a policy of liability insurance, a stolen vehicle, a motor vehicle operated without permission of the owner, an insured motor vehicle where the insurer disclaims liability or denies coverage or an unregistered vehicle.

*Id.* The UM Statute provides that "any such policy which does not contain the aforesaid provisions shall be construed as if such provisions were embodied therein." *Id.* The purpose of this mandatory UM coverage is to "afford an injured person 'the same protection as he [or she] would have had if he [or she] had been injured in an accident caused by an identifiable automobile covered by a standard automobile liability insurance policy in effect at the time of, and applicable to, the accident.'" *State Farm Mut. Auto. Ins. Co. v. Langan*, 865 N.Y.S.2d 102, 104 (2d Dep't 2008) (citations omitted).

The version of New York's SUM statute applicable to Plaintiff's claims[18] provides that, in addition to the mandatory UM coverage described above, "[a]ny such policy shall, at the option of the insured, also provide supplementary uninsured/underinsured motorists insurance for bodily injury, in an amount up to the bodily injury liability insurance limits of coverage provided under such policy," subject to statutorily specified maximums. N.Y. Ins. Law § 3420(f)(2)(A) (2013). The SUM Statute describes the process by which insurers must give insureds the option to purchase such SUM insurance:

> In addition to the notice provided, upon issuance of a policy of motor vehicle liability insurance pursuant to regulations promulgated by the superintendent, insurers shall notify insureds, in writing, of the availability of supplementary uninsured/underinsured motorists coverage. Such notification shall contain an explanation of supplementary uninsured/underinsured motorists coverage and the amounts in which it can be purchased.

---

[18] Insurance Law § 3420(f)(2) was substantively amended, effective June 16, 2018. See 2017 Sess. Law News of N.Y. Ch. 490 (S. 5644-B). Both parties rely on, and the Court applies, the version of the SUM Statute that was in effect at the time the XSA Policy was issued and Plaintiff's accident occurred.

> Subsequently, a notification of availability shall be provided at least once a year and may be simplified pursuant to regulations promulgated by the superintendent, but must include a concise statement that supplementary uninsured/underinsured motorists coverage is available, an explanation of such coverage, and the coverage limits that can be purchased from the insurer.

N.Y. Ins. Law § 3420(f)(2)(B) (2013).

The SUM Statute's implementing regulation, commonly referred to as Regulation 35-D,

11 N.Y.C.R.R. § 60-2, et seq., sets forth the specific requirements the required notice must

contain. Specifically, the version of Regulation 35-D in effect in October 2017[19] provides that:

> Every insurer writing motor vehicle liability insurance that satisfies the requirements of article 6 or 8 of the Vehicle and Traffic Law shall, with all new and renewal policies, provide a written notice in concise language that shall include:
>
> (i) a statement that SUM coverage is available, including the SUM limits being offered for purchase;
>
> (ii) the provisions set forth in section 60-2.1(a), (b) and (c) of this Subpart and an explanation of the difference between uninsured motorists (UM) coverage and SUM coverage; and
>
> (iii) the examples about SUM coverage set forth in subdivision (b) of this section.

Id. § 60-2.2(a)(1)(i)-(iii) (Sept. 1, 2017).

Where an insured chooses to purchase SUM coverage, Regulation 35-D sets forth

specific requirements for how that coverage must be described in the insurance policy's

declarations page, and also requires the insurance policy to include a SUM endorsement in the

form prescribed by the regulation. Id. § 60-2.3(a), (c), (d), (f). Regulation 35-D also provides

that, "[i]f the policyholder does not purchase SUM coverage, then the insurer shall issue, instead

of the SUM endorsement prescribed by [Regulation 35-D], the mandatory UM endorsement as

---

[19] Both parties rely on, and the Court applies, the version of Regulation 35-D that was in effect at the time the XSA Policy was issued and Plaintiff's accident occurred.

prescribed by the Motor Vehicle Accident Indemnification Corporation (MVAIC) and approved by the superintendent." *Id.* § 60-2.3(e).

### 3.    Analysis

As an initial matter, the parties dispute whether the XSA Policy included the mandatory UM coverage required by the UM Statute. Plaintiff points to the XSA Policy's language stating that "[n]o [UM] Coverage is offered or provided for vehicles principally garaged or registered" in New York, (Dkt. No. 20-22, at 20 (citing Dkt. No. 20-15, at 25)), as well as the fact that the XSA Policy contains neither the declarations nor the UM endorsement required by Regulation 35-D. (Dkt. No. 27, at 10-11). Defendant argues that the XSA Policy implicitly incorporates mandatory UM coverage through its New York-specific endorsements and notices, which include catch-all provisions requiring the policy to comply with New York's insurance laws regardless of anything in the policy to the contrary. (Dkt. No. 23-1, at 22-23 (citing Dkt. No. 2-15, at 167); Dkt. No. 28, at 7-8 (citing Dkt. No. 20-15, at 2)).

Regardless of which party's interpretation of the XSA Policy is correct, the result is the same. The UM Statute requires that the XSA Policy "shall be construed as if [the mandatory UM coverage provisions] were embodied therein." N.Y. Ins. Law § 3420(f)(1) (2013); *see also Royal Indem. Co. v. Providence Washington Ins. Co.*, 92 N.Y.2d 653, 659 (1998) ("Since the . . . exclusion is void as against public policy, the policy must be read as if the exclusion did not exist."); *Matter of Liberty Mut. Ins. Co. (Hogan)*, 82 N.Y.2d 57, 60 (1993) ("If an attempted exclusion is not permitted by law, the insurer's liability under the policy cannot be limited."). Thus, the Court must read the XSA Policy to include mandatory UM coverage regardless of the XSA Policy's terms. But this does not help Plaintiff. The vehicle that caused Plaintiff's accident did not fall into any of the categories to which the UM Statute's coverage provisions apply. *See* N.Y. Ins. Law § 3420(f)(1) (2013) (listing categories). Rather, it is undisputed that the vehicle

was an *underinsured*, not *uninsured*, vehicle; that the vehicle was covered by an insurance policy with a $50,000 limit; and that Plaintiff has already collected the full $50,000 (an amount that exceeds the relevant statutory maximum of $25,000 provided by the UM Statute) through a settlement with the insurer. (Dkt. No. 20-23, ¶¶ 4, 8; Dkt. No. 23-7, ¶¶ 4, 8; Dkt. No. 20-7; Dkt. No. 20-8). Therefore, Plaintiff would not be entitled to any recovery under the mandatory UM provisions read into the XSA Policy, and Plaintiff does not appear to contend otherwise.

The more significant controversy is whether Defendant offered XPO the option to purchase SUM coverage, as required by the SUM Statute and Regulation 35-D. Plaintiff argues that the plain terms of the XSA Policy unambiguously reflect that no option to purchase SUM coverage was offered in connection with that policy. Specifically, Plaintiff relies on the policy's clear language that "[n]o [UM or UIM] Coverage is offered or provided for vehicles principally garaged or registered" in New York, the fact that the notice required by the SUM Statute and Regulation 35-D is not included in the XSA Policy's "Schedule of Notices" or anywhere else in the policy, and the fact that the policy does not contain the SUM endorsement described in Regulation 35-D. (Dkt. No. 20-22, at 19-20; Dkt. No. 27, at 11-12). The Court agrees that, by its plain terms, the XSA Policy unambiguously reflects that no option to purchase SUM coverage was offered in connection with that policy, in violation of the SUM Statute and Regulation 35-D.

In arguing to the contrary, Defendant relies heavily on the fact that it *did* provide XPO with the required notice and option to purchase SUM coverage in connection with the MMT Policy (which XPO executed through the same representative and on the same day as the XSA Policy). (Dkt. No. 23-1, at 24; Dkt. No. 28, at 8; Dkt. No. 23-4, at ¶ 4; Dkt. No. 23-6, at 9-11). However, the SUM Statute and Regulation 35-D, by their plain terms, require the notice and offer to be provided in connection with *each* separate insurance policy issued, and Defendant

offers no authority to the contrary. *See* N.Y. Ins. Law § 3420(f)(2)(B) (2013) (requiring notice to

be provided "upon issuance of a policy of motor vehicle liability insurance" and annually

thereafter); 11 N.Y.C.R.R. § 60-2.2(a)(1) (Sept. 1, 2017) (requiring notice to be issued "with all

new and renewal policies"); *Id.* § 60-2.3(a) (stating requirements for declarations page of "every

new or renewal motor vehicle liability insurance policy issued"). The fact that the notice XPO

received did not explicitly state that it applied only to one particular policy does not change this

conclusion. (Dkt. No. 23-6, at 9-11). Even assuming that XPO subjectively understood or

believed that the notice provided with the MMT Policy actually constituted an offer to purchase

SUM insurance for *either* or *both* of the XSA and the MMT Policy, rather than the MMT Policy

alone (a contention which no evidence in the record supports),[20] this evidence would not be

admissible to modify the unambiguous terms of the XSA Policy, which make plain that no

option to purchase SUM coverage was offered in connection with that policy. *See, e.g., Spandex*

*House, Inc. v. Hartford Fire Ins. Co.*, 407 F. Supp. 3d 242, 251 (S.D.N.Y. 2019) ("Under New

York law, extrinsic evidence may not be used 'to create an ambiguity in a written agreement

which is complete and clear and unambiguous upon its face.'" (quoting *Sec. Plans, Inc. v. CUNA*

*Mut. Ins. Soc.*, 769 F.3d 807, 815-16 (2d Cir. 2014))).

Defendant also argues that the SUM Statute and Regulation 35-D only require that the

notice and offer to purchase SUM insurance be provided, and do not (as Plaintiff contends)

require them to be included in the insurance policy itself. (Dkt. No. 28, at 8). This argument

misses the point. Whether or not this is a legal requirement, the fact that the XSA Policy did not

contain the required notice in its lengthy set of notices supports Plaintiff's position that the

---

[20] To the contrary, the Fellows Declaration states that the required notice was included in the materials provided with the MMT Policy, and not those provided with the XSA Policy, and offers nothing suggesting that Fellows nonetheless understood the notice to apply to both policies. (Dkt. Nos. 23-4, 23-5, 23-6).

XSA's plain, unambiguous terms reflect that no SUM coverage was offered. This is particularly true when considered in combination with the language explicitly stating that "[n]o [UM or UIM] Coverage is offered or provided for vehicles principally garaged or registered" in New York, (Dkt. No. 20-15, at 25). Defendant also argues that the Fellows declaration, and the evidence attached thereto (including the unsigned New York-specific offer to purchase SUM insurance connected to the MMT Policy), clearly establishes XPO's broad intent to reject SUM coverage wherever it was offered, including in New York. (Dkt. No. 23-1, at 24). This argument is equally unavailing, as XPO's intent to reject SUM coverage does not excuse Defendant from its legal obligation to offer it in the form and manner prescribed by the SUM Statute and Regulation 35-D.

Having found that the XSA Policy violated the SUM Statute and Regulation 35-D because XPO received no offer to purchase SUM insurance in connection with that policy, the remaining question is whether the law offers Plaintiff a remedy for this violation. Plaintiff argues that the Court should read the XSA Policy to provide UM and UIM coverage in limits equal to its bodily injury limits of liability, *i.e.* $7 million. (Dkt. No. 20-22, at 20-22; Dkt. No. 27, at 14-15). Defendant argues that, because SUM coverage is optional rather than mandatory under New York law, the Court should not read any such coverage into the policy, or alternatively, should at least limit that coverage to the statutory maximums. (Dkt. No. 23-1, at 25-26; Dkt. No. 28, at 8-9).

As Plaintiff correctly asserts, New York law is clear that, where an insurance policy improperly excludes coverage that is mandated by law, the insurance policy must be read as if that exclusion did not exist. (Dkt. No. 27, at 15 (collecting case law)). As Defendant correctly asserts, however, neither this principle nor the case law Plaintiff relies on to support it resolves

the issue at hand, as that case law does not address the situation where, as here, Defendant's violation was its failure to provide notice of and offer coverage that was *optional*, and must be affirmatively selected by the insured, under law (and which the insured apparently had no intention of purchasing), rather than its exclusion of coverage that was *mandatory* under law. (Dkt. No. 28, at 8-9 (distinguishing case law)).

Plaintiff concedes that he has "not been able to locate a case applying New York law where the insurance company failed to even offer SUM coverage or failed to provide the mandatory forms." (Dkt. No. 20-22, at 20-21). As an alternative, he relies on *Matter of Arner v. Liberty Mut. Ins. Co.*, a New York Appellate Division case in which the court affirmed an arbitration award reading an insurance policy to provide uninsured motorist coverage in the amount of $300,000 where the defendant violated a Maryland law requiring the defendant to offer that coverage to the insured in writing. 649 N.Y.S.2d 185, 186-87 (2d Dep't 1996). Setting aside the different procedural posture of that case, that case involved application of Maryland's law on reformation of contracts, which is irrelevant to this case.

By contrast, the limited case law applying New York law suggests that, even where an insurer has violated the notice provisions of the SUM Statute and Regulation 35-D, these laws do not grant insureds a private right of action to seek reformation of the terms of an insurance policy that, by its plain terms, excludes SUM coverage. *Feinblum v. Liberty Mut. Ins. Co.*, No. 02-cv-5085, 2003 WL 21673620, at *3, 2003 U.S. Dist. LEXIS 12266, at *9-10 (S.D.N.Y. July 16, 2003) ("Additionally, plaintiff has introduced no authority to suggest that Regulation 35-D creates a private right of action that could be enforced to abrogate the terms of the insurance policy. All case law cited is to the contrary."); *Certain Underwriters at Lloyd's, London v. Plasmanet, Inc.*, No. 01-cv-6023, 2002 WL 1788020 at *3, 2002 U.S. Dist. LEXIS 14190, at *9

(S.D.N.Y. August 1, 2002) ("Typically, courts do not construe the Insurance Law as providing for a private right of action, in the absence of express language authorizing such enforcement." (quoting *Bauer v. Mellon Mortgage Co.*, 680 N.Y.S.2d 397, 400 (N.Y. Sup. Ct. 1998)). And Plaintiff does not otherwise argue that he has standing to bring, or can meet the requirements of, a reformation of contracts claim under New York law. *See O'Brien v. Argo Partners, Inc.*, 736 F. Supp. 2d 528, 573 (E.D.N.Y. 2010) ("Under New York Law, reformation of contracts is warranted only in cases of mutual mistake, where the written agreement contradicts the intent of both parties, or in cases of fraud, where 'the parties have reached agreement and, unknown to one party but known to the other (who has misled the first), the subsequent writing does not properly express that agreement.'" (quoting *Chimart Assocs. v. Paul*, 66 N.Y.2d 570 (1986))).

Therefore, the Court declines to read any SUM coverage into the XSA Policy.[21] As such, the Court grants Defendant's motion for summary judgment, and denies Plaintiff's motion for summary judgment, on this question.

## V.     CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiff's motion for summary judgment (Dkt. No. 20) is **GRANTED** as to Plaintiff's claim under Indiana law and **DENIED** as to Plaintiff's claim under New York law; and it is further

---

[21] Even if the Court were to read SUM coverage into the XSA Policy as a remedy for Plaintiff's claim, Plaintiff offers no authority that supports his argument the Court should find the amount of that coverage to equal XSA Policy's full $7 million bodily injury liability limit, when the SUM Statute unambiguously reads that SUM coverage must be provided "in an amount up to the bodily injury liability insurance limits of coverage provided under such policy, *subject to*" statutory maximums, including a $250,000 limit for bodily injury to a single person in a single accident. N.Y. Ins. Law § 3420(f)(2)(A) (2013) (emphasis added).

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 23) is **DENIED** as to Plaintiff's claim under Indiana law and **GRANTED** as to Plaintiff's claim under New York law; and it is further

**ORDERED** that Plaintiff's claim under New York law is **DISMISSED with prejudice** in its entirety; and it is further

**ORDERED** that the Court finds that, by operation of law, the XSA Policy includes uninsured motorist insurance coverage to the extent required by Indiana Code § 27-7-5-2(a).

**IT IS SO ORDERED.**

Dated: February 5, 2021
       Syracuse, New York

Brenda K. Sannes
U.S. District Judge